**ORDERED.**

Dated:  September 20, 2022

_____
Jacob A. Brown
United States Bankruptcy Judge

## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

In re:

SAM PARKER COATS and                    CASE NO. : 3:21-bk-02641-JAB
FRANCES ELAINE COATS,

    Debtors.

_____/

### AMENDED[1] FINDINGS OF FACT AND CONCLUSIONS OF LAW

    This case came before the Court on June 2, 2022 for a trial (the "Trial") at which

Aaron R. Cohen, Chapter 7 Trustee (the "Trustee"), the Debtors Sam Parker Coats

("Mr. Coats") and Frances Elaine Coats ("Mrs. Coats") (together, the "Debtors") and

Sugar Mill Plantation Homeowners' Association, Inc. (the "HOA")[2] were present.

The Court considered the following contested matters at the Trial: (i) the Debtors'

---

[1] These Findings of Fact and Conclusions of Law amend the Findings of Fact and Conclusions of Law dated September 19, 2022 to reflect the corrections to pages 18 and 19 as set forth herein.

[2] Altogether, the Trustee, the Debtors, and the HOA shall be referred to as the "Parties."

Claim of Exemptions (Doc. No. 10); (ii) the Trustee's Objection to the Debtors' Claim of Exemptions (the "Trustee OTE") (Doc. No. 25); (iii) the HOA's Objection to the Debtors' Claim of Exemptions (the "HOA OTE") (Doc. No. 32); (iv) the Debtors' responses and objections to the Trustee OTE and the HOA OTE (Doc. Nos. 36, 43 and 48); (v) the Motion for Relief from Stay filed by the HOA (the "MFR") (Doc. No. 15); (vi) the Trustee's Objection to the MFR (Doc. No. 26); (vii) the Debtors' responses and objections to the MFR (Doc. Nos. 16, 20 and 27); (viii) Count I of the Complaint filed in the matter styled *Aaron R. Cohen, Chapter 7 Trustee v. Sugar Mill Plantation Homeowners' Association, Inc., et al*; United States Bankruptcy Court, Middle District of Florida, Jacksonville Division; Adversary Case No. 3:22-ap-00002-JAB (the "Trustee AP")[3]; (ix) Counts I and II of the Amended Complaint filed in the matter styled *Sugar Mill Plantation Homeowners' Association, Inc. v. Sam Parker Coats and Frances Elaine Coats*; United States Bankruptcy Court, Middle District of Florida, Jacksonville Division; Adversary Case No. 3:21-ap-00105-JAB (the "HOA AP"); and (x) the First Counterclaim and Second Counterclaim asserted by the Debtors against the HOA in the HOA AP (collectively, the matters heard at the Trial will be referred to as the "Contested Matters").[4]

The Trial spanned the course of more than five hours, during which time the Court received over seventy (70) exhibits into evidence, including seven (7) deposition

[3] On May 23, 2022, the Court entered a Consent Final Judgment (the "Consent Final Judgment") as to Count II of the Trustee AP. (Trustee AP Doc. No. 15) (*see infra*).
[4] The Contested Matters were previously consolidated by virtue of entry of the Order Granting Motion for Entry of Order Consolidating Proceedings dated March 17, 2022 (Doc. No. 93).

transcripts submitted as part of the record, and heard testimony from seven (7) live witnesses. The Parties submitted pre-Trial briefs to the Court with supporting case law in support of their respective positions (*see* Doc. Nos. 142, 144, and 146), as well as proposed Findings of Fact and Conclusions of Law, all of which the Court has reviewed and taken into consideration. Upon consideration of the Contested Matters and the record in the main bankruptcy case, the Trustee AP and the HOA AP, and the testimony, evidence, and arguments of counsel made at the Trial, the Court makes the following Findings of Fact and Conclusions of Law pursuant to Fed.R.Bankr.P. 9014(c) and 7052.

## **Findings of Fact**

On November 9, 2021 (the "Petition Date"), the Debtors, both of whom are 85 years of age, filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code (the "Bankruptcy Case") (Doc. No. 1), and Aaron R. Cohen was appointed as Chapter 7 Trustee in the Bankruptcy Case. On their Schedule A/B (Doc. No. 10), the Debtors listed an interest in two parcels of real property: (i) 3636 Riveredge Drive, Jacksonville, Florida 32277 (the "Duval Property"), and (ii) 46 Audubon Lane, Flagler Beach, Florida 32136 (the "Flagler Property").[5] As the names suggest, the Duval Property is located in Duval County, Florida, and the Flagler Property is located in Flagler County, Florida, with an approximate one-hour drive between the two Properties. On their petition, the Debtors indicated that they lived at the Duval

---

[5] Together, the Duval Property and the Flagler Property are referred to herein as the "Properties."

Property. On their Schedule C (Doc. No. 10), the Debtors claimed exemptions in the Duval Property pursuant to Fla. Const. Art. X, § 4(a)(1) and Fla. Stat. §§ 222.01 and 222.02. The Debtors did not claim any exemptions in the Flagler Property on their Schedule C. On their Statement of Financial Affairs (Doc. No. 11), in response to Question No. 2, the Debtors indicated that during the three (3) years prior to the Petition Date, they resided at the Flagler Property from 2018 through February 2019.

The Debtors originally purchased the Duval Property in 1972. In 1993, the Debtors sold the Duval Property to their son, with a verbal agreement that he was prohibited from selling the property to any third-party. Thereafter, on November 26, 1997, the Debtors, as Trustees under The Coats Family Trust dated March 25, 1997, re-purchased the Duval Property from their son and took title to same. The Debtors have therefore owned the Duval Property approximately 46 years, cumulatively. Despite being titled in the name of the Debtors as Trustees under The Coats Family Trust dated March 25, 1997, the Court finds that the Debtors held both legal and equitable title to the Duval Property as of the Petition Date.

The Parties agree that as of the Petition Date, the Duval Property was encumbered by a mortgage lien in the amount of $32,361.00. There were no other mortgage liens encumbering the Duval Property as of the Petition Date.

There is no dispute between the Parties that the Duval Property served as an investment property and generated rental income for the Debtors from 1997 until November 2018, when the Debtors removed the last tenant from the Duval Property.

In other words, it is undisputed that the Debtors did not live in the Duval Property from 1997 until a date between November 2018 and after the Petition Date.

On August 31, 1999, the Debtors, as Co-Trustees of The Coats Family Trust dated March 25, 1997, took title to the Flagler Property, which was then a vacant lot.[6] Upon the Debtors' purchase of the Flagler Property, they became members of the HOA and subject to the HOA covenants and restrictions. In 2007 the Debtors completed the construction of a home on the Flagler Property and moved into the property.

The Debtors claimed the Flagler Property as their homestead for property tax purposes from 2011 through 2018, after which they began claiming the Duval Property as their homestead for property tax purposes.[7] Although the Debtors resided at the Flagler Property from 2007 until at least November 2018, they voted in Duval County during that time.[8] On May 20, 2019, in their application to open a bank account with Community First Credit Union, the Debtors listed the Duval Property address as their address.[9] Additionally, the title and registration for the Debtors' 2017 Lincoln MXT vehicle, which was issued on June 6, 2019, bears the Duval Property address.[10]

On or about July 24, 2019, the Debtors obtained an insurance policy for the Duval Property. The insurance policy declaration page, effective July 24, 2019 through July 24, 2020, reflects a "Landlord Dwelling" insurance policy, indicating that the

---

[6] Joint Ex. 20.
[7] Debtors' Exs. 6, 5.
[8] Debtors' Ex. 4.
[9] Debtors' Ex. 11.
[10] Debtors' Ex. 3.

property was insured as an investment/rental property.[11] The policy lists the Flagler Property address as Mr. Coats' mailing address and the Duval Property as Mrs. Coats' mailing address.[12]

During January 2020, the Debtors' Social Security Benefits statements for 2019 were mailed to the Flagler Property address.[13] On June 8, 2020, the Debtors filed their 2018 and 2019 federal income tax returns, both of which listed the Flagler Property as their home address.[14]

### State Court Litigation

Sometime before June 2010, the St. Johns Water Management District (the "SJWMD"), which oversees the retention areas in Sugar Mill Plantation, observed that several homeowners in the neighborhood, including the Debtors, had taken action which resulted in encroachment upon a protected retention area.[15] The retention area was a holding area for the overflow of flood waters and storm runoff and was adjacent to the homeowners' property.[16] According to Bruce Oswald ("Mr. Oswald"), director and vice-president of the HOA, the Debtors changed the elevation of the retention area adjacent to their property by installing irrigation and sodding over native plants.[17]

---

[11] Joint Ex. 25.
[12] *Id.*
[13] Joint Exs. 28, 29.
[14] Joint Exs. 41, 42.
[15] Debtors' Ex. 24 at pp. 7-9.
[16] *Id.* at pp. 9-10.
[17] *Id.* at p. 9.

In June 2010, the SJWMD notified the HOA of the encroachment.[18] The HOA and all the encroaching homeowners, except the Debtors, reached an agreement by which the HOA would obtain a permit modification from the SJWMD, which would allow the encroachment to remain, in exchange for the homeowners signing an affidavit agreeing not to further encroach upon the protected retention area and to share in the cost of the modification, which was $1,600 per homeowner.[19] As a result of the Debtors' failure to participate in the permit modification, in 2015, the HOA initiated litigation against the Debtors in that certain case styled *Sugar Mill Plantation Homeowners' Association, Inc.   v.   Sam P. Coats and Frances E. Coats, individually and as Co-Trustees of The Coats Family Trust dated March 25, 1997*; Circuit Court, Seventh Judicial Circuit, Flagler County, Florida; Case No. 2015-CA-98 (the "State Court Action").[20]

On June 5, 2019, approximately four years after the commencement of the State Court Action and nine years after the SJWMD notified the HOA of the encroachment, the Trial Court in the State Court Action entered an Order Granting the HOA's Motion for Partial Summary Judgment as to Liability for Counts I and II.[21] On July 3, 2019, the Debtors filed a change of address form with the Flagler County Circuit

---

[18] *Id.* at p. 11.
[19] *Id.* at pp. 11-12.
[20] *Id.* at p. 13.
[21] Joint Ex. 12.

Court.[22] Thereafter, a number of papers in the State Court Action were mailed to the Duval Property instead of the Flagler Property.[23]

**Entry and Recording of First Judgment**

On October 10, 2020, the Trial Court in the State Court Action entered a final judgment as to attorneys' fees and costs in favor of the HOA and against the Debtors, in their individual capacity and as Co-Trustees of The Coats Family Trust dated March 25, 1997, in the total amount of $123,601.61, plus interest (the "First Judgment"). On October 29, 2020, the HOA recorded a certified copy of the First Judgment in the Official Public Records of Duval County, Florida at Book 19430, Page 1928 (the "First Recorded Judgment").[24] From December 23, 2019 to October 23, 2020 and from early January 2020[25] to November 2, 2020, respectively, the Debtors used 1,601 kwh of electricity at the Duval Property, compared to 7,891 kwh of electricity at the Flagler Property. From October 23, 2020 to November 23, 2020 and from November 2, 2020 to December 1, 2020, respectively, the Debtors used 193 kwh of electricity at the Duval Property compared to 534 kwh of electricity at the Flagler Property.[26]

From December 22, 2019 to October 22, 2020 and from January 2, 2020 to November 2, 2020, respectively, the Debtors used 3,000 gallons of water at the Duval

---

[22] Joint Ex. 12.

[23] Debtors' Ex. 13.

[24] Joint Ex. 17.

[25] *See* Joint Ex. 7. These readings are taken from business records produced by Jacksonville Electric Authority ("JEA") and Florida Power & Light Company ("FPL"), the entities which provide electric service to the Duval Property and Flagler Property, respectively. Since JEA and FPL conduct their monthly meter readings at different times of the month, the time period(s) indicated herein also slightly vary. The dates indicated herein are the closest possible dates to October 29, 2020.

[26] *Id.*

Property, compared to 37,000 gallons of water at the Flagler Property.[27] Between October 1, 2020 and October 31, 2020, the Debtors used 50 gallons of water at the Duval Property, compared to 3,790 gallons of water at the Flagler Property.[28]

Between January 2020 and October 2020, the Debtors made or received 358 telephone calls from the Duval County area, as opposed to 5,086 telephone calls from the Flagler County area.[29]

On November 30, 2020, at a time when the Debtors maintain they were residing permanently in the Duval Property and had been so since sometime between November 2018 and February 2019, the Debtors paid $10,736.15 in cash for the outstanding 2019 property taxes for the Flagler Property[30] while failing to remit payment for the outstanding 2019 Duval Property taxes, which were less than $2,700.[31] On February 4, 2021, the Debtors timely paid the 2020 property taxes for the Flagler Property in the amount of $9,065.17.[32] As of the Petition Date, the Debtors were delinquent on payment of their property taxes for the Duval Property in the amount of $7,757.33, which appears to be three years-worth of property taxes.[33] The

---

[27] *See* Joint Ex. 9. These readings are taken from business records produced by JEA and Volusia County Water Resources and Utilities ("Volusia County Water"), the entities which provide water service to the Duval Property and Flagler Property, respectively. Since JEA and Volusia County Water conduct their monthly meter readings at different times of the month, the time period(s) indicated herein also slightly vary. Again, the dates indicated herein are the closest possible dates to October 29, 2020.

[28] Joint Ex. 8. This reading is taken from business records produced by JEA and Volusia County Water as to the Debtors' daily water usage.

[29] Joint Ex. 58.

[30] Joint Ex. 33.

[31] Joint Ex. 32.

[32] Joint Ex. 33.

[33] (Doc. No. 10); Joint Ex. 30.

Debtors ultimately paid the 2019 property taxes for the Duval Property in the amount of $2,695.72 on March 4, 2022, but there is no evidence that the remaining outstanding pre-Petition Date balance of property taxes for the Duval Property have been paid.[34]

### Entry and Recording of Second Judgment

On March 11, 2021, the Trial Court in the State Court Action entered a final judgment as to attorneys' fees and costs in favor of the HOA and against Debtors, in their individual capacity and as Co-Trustees of The Coats Family Trust dated March 25, 1997, in the total amount of $4,719.75, plus interest (the "Second Judgment"). On that same day, the Trial Court in the State Court Action entered an Order Granting the HOA's Motion for Sanctions and for Order to Show Cause where it found that the Debtors failed to comply with discovery in connection with the HOA's attempt to execute on the First Judgment.[35] The Order stated: "the [Debtors]' continued disregard of the Florida Rules of Civil Procedure and the Court's orders has, unnecessarily increased the financial burden of this lawsuit to [the HOA], unnecessarily burdened this Court with resulting motions, hearings and orders and unnecessarily caused delay in the orderly progress of this lawsuit."[36] The Trial Court found the Debtors' disobedience to be willful, deliberate, and contumacious instead of an act of neglect or inexperience.[37]

---

[34] Joint Ex. 32.

[35] Joint Ex. 3 from May 31, 2022 hearing on Motion to Take Notice of and to Adopt Findings of Special Magistrate (*see infra*).

[36] *Id.*

[37] *Id.*

On May 10, 2021, Mr. Coats obtained a driver's license, which bears the Duval Property address.[38] On July 29, 2021, the HOA recorded a certified copy of the Second Judgment in the Official Public Records of Duval County, Florida at Book 19837, Page 2314 (the "Second Recorded Judgment").[39]

From October 23, 2020 to August 25, 2021 and from November 2, 2020 to September 1, 2021, respectively, the Debtors used 2,038 kwh of electricity at the Duval Property, compared to 5,455 kwh of electricity at the Flagler Property.[40] From July 26, 2021 to August 25, 2021 and from August 2, 2021 to September 1, 2021, respectively, the Debtors used 293 kwh of electricity at the Duval Property compared to 451 kwh of electricity at the Flagler Property.[41]

From November 1, 2020 through July 31, 2021, the Debtors used 980 gallons of water at the Duval Property, compared to 41,380 gallons of water at the Flagler Property.[42] From July 1, 2021 through July 31, 2021, the Debtors used 20 gallons of water at the Duval Property compared to 5,180 gallons of water at the Flagler Property.[43]

From November 2020 through the end of July 2021, the Debtors made or received 772 telephone calls from the Duval County area as opposed to 4,129 telephone calls from the Flagler County area.[44]

---

[38] Joint Ex. 27.
[39] Joint Ex. 18.
[40] Joint Ex. 7.
[41] *Id.*
[42] Joint Ex. 9.
[43] *Id.*
[44] Joint Ex. 58.

## Entry and Recording of Third Judgment

On July 14, 2021, the Trial Court in the State Court Action entered a final judgment for unpaid contempt fines in favor of the HOA and against the Debtors, in their individual capacity and as Co-Trustees of The Coats Family Trust dated March 25, 1997, in the amount of $157,000.00, plus interest (the "Third Judgment") (and altogether, the First Judgment, the Second Judgment, and the Third Judgment will be referred to as the "Judgments"). On August 16, 2021, the HOA recorded a certified copy of the Third Judgment in the Official Public Records of Duval County, Florida at Book 19865, Page 829 (the "Third Recorded Judgment")[45] (and together with the First Recorded Judgment and Second Recorded Judgment, the "Recorded Judgments").[46]

As the Court noted, from July 26, 2021 to August 25, 2021 and from August 2, 2021 to September 1, 2021 respectively, the Debtors used 293 kwh of electricity at the Duval Property compared to 451 kwh of electricity at the Flagler Property.[47] During

---

[45] Joint Ex. 19. In the various pleadings filed by the Trustee, the Trustee asserted that the Third Recorded Judgment was avoidable as a preferential transfer pursuant to 11 U. S. C. § 547 because it was recorded within ninety (90) days of the Petition Date. As such, Count II of the complaint filed in the Trustee AP sought to avoid the Third Recorded Judgment pursuant to 11 U. S. C. § 547. Ultimately, the Trustee and the HOA entered into the Consent Final Judgment only as to Count II of the complaint which was entered by the Court on May 23, 2022 (Trustee AP Doc. No. 15). The Consent Final Judgment provides that if the Court determines the Duval Property is not exempt as the Debtors' homestead, then the Third Recorded Judgment will be preserved for the benefit of the estate pursuant to 11 U. S. C. § 551. The effect of this provision would be to allow the Trustee to "step into the shoes" of the HOA as to the lien position of the Third Recorded Judgment on the Duval Property, and to preserve the equity to which the Third Recorded Judgment could attach. The Debtors did not object to the entry of the Consent Final Judgment.

[46] Each of the dates of recording of the Judgments is of critical importance to the Court's analysis because one of the primary disputes among the Parties is whether the Recorded Judgments operate as valid and enforceable liens against the Duval Property.

[47] Joint Ex. 7.

August 2021, the Debtors made or received 212 telephone calls from the Duval County area, as opposed to 678 telephone calls from the Flagler County area.[48] From August 1, 2021 through August 31, 2021, the Debtors used 120 gallons of water at the Duval Property, compared to 3,260 gallons at the Flagler Property.[49]

The Court heard the testimony of James Wojnar ("Mr. Wojnar"), the owner of A1A Investigators, Inc. ("A1A"), and received evidence regarding surveillance Mr. Wojnar conducted at the HOA's behest to determine whether anyone was residing at the Duval Property. According to Mr. Wojnar's testimony and affidavit, he arrived at the Duval Property on August 3, 2021 at 7:00 a.m.[50] The garage door was closed, there were no vehicles in the driveway, and the window blinds were closed.[51] Mr. Wojnar attested "the house looked vacant and that the landscape was overgrown."[52] Mr. Wojnar remained onsite at the Duval Property until 3:03 p.m.[53] He did not observe any movement at the Duval Property from the hours of 7:00 a.m. until 3:03 p.m.[54]

**September 2021**

From August 25, 2021 to September 24, 2021 and from September 1, 2021 to October 1, 2021, respectively, the Debtors used 301 kwh of electricity at the Duval Property compared to 463 kwh of electricity at the Flagler Property.[55] From September

---

[48] Joint Ex. 58.
[49] Joint Ex. 9.
[50] Joint Ex. 15.
[51] *Id.*
[52] *Id.*
[53] *Id.*
[54] *Id.*
[55] Joint Ex. 7.

1, 2021 through September 30, 2021, the Debtors used 470 gallons of water at the Duval Property compared to 2,360 gallons of water at the Flagler Property.[56] During September 2021, the Debtors made or received 170 telephone calls in the Duval Property area and made or received 692 calls in the Flagler Property area.[57]

Mr. Wojnar returned to the Duval Property a second time on September 28, 2021 (the "September Inspection"), which inspection was being conducted pursuant to Court Order entered in the State Court Action.[58] As part of their case-in-chief, the HOA and the Trustee submitted into evidence a ten-minute video taken by Mr. Wojnar during the September Inspection, allowing the Court to see the condition and contents of the Duval Property on that date.[59] Mr. Wojnar's summary from the September Inspection states:

> The investigator notes that there was no refrigerator inside the kitchen or silverware. Every room in the residence was under construction and it appeared as if nobody was living in the residence.[60] Some of the bathrooms had the toilets removed. Video documentation and time stamped photos were secured of the property.[61]

At Trial, Mr. Wojnar also testified that he opened the refrigerator located in the garage during his inspection, only to find bottles of water but no food, save for a single

---

[56] Joint Ex. 8.

[57] Joint Ex. 58.

[58] Joint Ex. 16.

[59] Id.

[60] The Court notes that while the Duval Property appeared to be in a state of disarray, the Debtors had already spent over $20,000 on the property, including $6,800 for new cabinets, $10,000 for new wood flooring, $900 for crown molding, and $2,500 for painting. (Joint Ex. 11, p. 97). Mr. Coats testified the Duval Property was livable as of March 2021. (Joint Ex. 11, p. 20).

[61] Id.

jar of peanut butter. He further testified that the bed in the master suite[62] appeared to be unused and/or new and that there were boxes of flooring in one of the bedrooms. He also testified that only one bathroom in the Duval Property was operational.

Finally, Mr. Oswald, who lives nine houses away from the Flagler Property, testified that he and his wife took regular walks past the Flagler Property approximately three to four days per week and also drove by the Flagler Property multiple times per week.[63] Mr. Oswald testified the Debtors' vehicle was parked at the Flagler Property on a regular basis, and he witnessed the Debtors driving their vehicle through the neighborhood multiple times per week.[64] Mr. Oswald testified that the Debtors' trash can was regularly placed at the curb for periodic trash collection. Based on his observations, Mr. Oswald testified that it appeared the Debtors were residing in the Flagler Property as of September 21, 2021.[65]

### Proceedings Supplementary and Magistrate Findings

On August 24, 2021, after recording the Third Judgment in Duval County, Florida, the HOA filed a Motion for Proceedings Supplementary in the State Court Action.[66] The primary issue raised in the Motion for Proceedings Supplementary was whether the Duval Property or the Flagler Property was the Debtors' homestead

---

[62] The bed in the pictures taken by Mr. Wojnar is a twin-size bed.
[63] Debtors' Ex. 24 at p. 23.
[64] *Id.* at p. 29.
[65] *Id.* at pp. 19-22, 24-25.
[66] *See* Joint Ex.12.

property on the respective dates the Judgments were recorded in Duval County, Florida: October 29, 2020, July 29, 2021, and August 16, 2021.

On September 14, 2021, the Trial Court in the State Court Action entered an Order for Proceedings Supplementary Requiring Appearance of Defendants (the "Order for Proceedings Supplementary") by which the court appointed Scott W. Spradley as Special Magistrate (the "Magistrate") to examine the Debtors concerning the issues raised in the Motion for Proceedings Supplementary. Specifically, the Trial Court ordered the Debtors to appear before the Magistrate on September 21, 2021 to provide testimony as to whether the Duval Property was their homestead property. The Trial Court ordered the Magistrate to report his findings and recommendations within ten (10) days of concluding the examination and scheduled a hearing to determine whether to adopt the Magistrate's findings and recommendations for November 10, 2021.

The Debtors appeared on September 21, 2021 before the Magistrate, with the assistance and benefit of counsel. Mrs. Coats testified before the Magistrate, but Mr. Coats did not. The Magistrate also heard testimony from Mr. Oswald. Following the September 21, 2021 hearing, the Magistrate prepared findings and recommendations which are dated November 9, 2021 (the "Magistrate Findings").[67] However, the Debtors filed this Bankruptcy Case on November 9, 2021 before the Magistrate filed his findings with the Trial Court. The Magistrate did not thereafter file the Magistrate

---

[67] Joint Ex. 14.

Findings with the Trial Court for fear of violating the automatic stay provisions of 11 U.S.C. § 362, and the November 10, 2021 hearing before the Trial Court was cancelled.[68]

The Magistrate determined that, based on the record before him, the testimony of Mrs. Coats and Mr. Oswald, and other discovery he had previously reviewed, the Flagler Property was the Debtors' homestead as of September 21, 2021. Among other things, the Magistrate relied on the following: (i) Mrs. Coats' testimony that there was no dishwasher in the Duval Property;[69] (ii) Mrs. Coats' testimony that there was no water usage at the Duval Property in July and August of 2021 because the Debtors kept the water turned off most of the time;[70] (iii) the last utility bill evidencing water usage for the Duval Property was in August 2019;[71] (iv) the Debtors' 2019 Federal Income Tax Return reflects rental income being received from the Duval Property during the 2019 tax year;[72] (v) the Debtors maintained cable and internet services at the Flagler Property through March 2021, yet none at the Duval Property for the same

---

[68] On May 12, 2022, the HOA filed a Motion to Take Notice of and to Adopt the Magistrate Findings (the "Magistrate Findings Motion") (Doc. No. 133), arguing that the issue of whether the Debtors' homestead was the Duval Property or the Flagler Property on the critical dates (the dates each of the Judgments were recorded in Duval County) had already been decided and that, based on collateral estoppel, this Court was authorized to adopt the Magistrate Findings. On May 31, 2022, the Court conducted a trial on the Magistrate Findings Motion at which it admitted certain evidence, including the Magistrate Findings, the transcript from the September 21, 2021 hearing before the Magistrate (the "Magistrate Transcript") (Joint Ex. 13), and other filings in the State Court Action related to the Motion for Proceedings Supplementary. The Court also heard the testimony of the Magistrate. The Court ruled that the exhibits admitted into evidence at the May 31, 2022 hearing and the Magistrate's testimony would be considered part of the evidence at the June 2, 2022 Trial.
[69] Joint Ex. 14.
[70] *Id.*
[71] *Id.*
[72] *Id.*

time period;[73] (vi) the Duval Property contained only the following furniture as of September 21, 2021: two air mattresses, a dinette set, and a sofa;[74] (vii) there was no stove or refrigerator in the kitchen, but only a refrigerator located in the garage, which was abandoned by a former tenant of the Duval Property;[75] (viii) as of September 21, 2021, the Debtors' blind family cat resided at the Flagler Property;[76] (ix) as of September 21, 2021, the Debtors' furniture and clothing remained in the Flagler Property;[77] (x) the Debtors' credit card statements reflected a greater frequency of transactions occurring in Palm Coast (Flagler County) than in Jacksonville (Duval County);[78] and (xi) the Debtors could not produce to the Magistrate an inventory of items at the Duval Property because "I didn't have anything."[79]

### October 2021

The Debtors' water and electric usage at the Duval Property exceeded that at the Flagler Property for the first time in October 2021.[80] From September 24, 2021 to October 25, 2021 and from October 1, 2021 to November 1, 2021, respectively, the Debtors' used 494 kwh of electricity at the Duval Property compared to 346 kwh at the Flagler Property.[81] From October 1, 2021 through October 31, 2021, the Debtors

---

[73] *Id.*
[74] *Id.*
[75] *Id.*
[76] *Id.*
[77] *Id.*
[78] *Id.*
[79] *Id.*
[80] This sentence corrects the Findings of Fact and Conclusions of Law dated September 19, 2022 to reflect that the Debtors' water and electric usage at the Duval Property exceeded that at the Flagler Property for the first time in October 2021.
[81] Joint Ex. 7.

used 1,300 gallons of water at the Duval Property compared to 690 gallons at the Flagler Property.[82] During October 2021, the Debtors made or received 646 telephone calls in the Duval Property area and made or received 360 telephone calls in the Flagler Property area.[83]

### November 9, 2021 – the Petition Date and Thereafter

The Debtors' water and electric usage at the Duval Property again exceeded that at the Flagler Property in November 2021.[84] From October 25, 2021 to November 23, 2021 and from November 1, 2021 to December 1, 2021, respectively, the Debtors used 770 kwh of electricity at the Duval Property compared to 481 kwh at the Flagler Property.[85] From November 1, 2021 through November 30, 2021, the Debtors used 1,900 gallons of water at the Duval Property compared to 1,520 gallons at the Flagler Property.[86] The Debtors made or received 341 calls in the Duval Property area and made or received 452 calls in the Flagler Property area during November 2021.

At the Trial, the Court heard the testimony of Naji Hassan of 7 Star Realty, Realtor for the bankruptcy estate ("Mr. Hassan"), who conducted an inspection of the Flagler Property on January 15, 2022. Mr. Hassan took over 300 photographs of the Flagler Property documenting its condition.[87] Mr. Hassan testified that the Flagler

---

[82] Joint Ex. 9.
[83] Joint Ex. 58.
[84] This sentence corrects the Findings of Fact and Conclusions of Law dated September 19, 2022 to reflect that the Debtors' water and electric usage at the Duval Property again exceeded that at the Flagler Property in November 2021.
[85] Joint Ex. 7.
[86] Joint Ex. 9.
[87] Joint Ex. 40.

Property was fully furnished and decorated and there was food located in the refrigerator and pantry, including eggs, milk and basic non-perishables. Mr. Hassan also testified that the closets in the Flagler Property were "full of clothes, wall to wall," there was a litter box located in the master bedroom suite, and both the electric and water services were operating. Based on a review of the post-petition photographs of the Flagler Property, the Court agrees that there was an enormous amount of personal property in the Flagler Property and that, albeit in disarray, the Flagler Property appeared to be fully furnished and decorated as of January 15, 2022.

The Court also heard the testimony of Peter Mocke, appraiser for the bankruptcy estate, who was admitted as an expert appraiser upon stipulation by the Parties ("Mr. Mocke"). Mr. Mocke inspected both Properties post-petition and performed an appraisal of the Duval Property on January 19, 2022.[88] Mr. Mocke (and Mr. Hassan) testified that the personal property remaining in the Flagler Property post-petition was overwhelming and significant and included personal items such as financial papers, Christmas ornaments, and artwork.

Mr. Mocke testified that the personal property located in the Duval Property consisted of pots and pans, a dinette set, clothing in the closets, and "enough furniture to live."[89] Mr. Mocke also testified that much of the property itself was under construction, the master bedroom was meagerly furnished with a mattress on the floor

---

[88] Joint Ex. 39.
[89] Based on Mr. Wojnar's testimony and video evidence of the contents of the Duval Property as of September 28, 2021, the Court concludes that the Debtors must have relocated additional items of personal property to the Duval Property between September 28, 2021 and Mr. Mocke's January 19, 2022 inspection.

but no bedframe, there was only one working toilet, there was no refrigerator inside the residence, and prints/other paintings were on the floor stacked against the wall rather than hanging on the wall. His testimony is consistent with the appraisal he performed of the Duval Property on January 19, 2022.[90]

The Trustee also testified at Trial. The Trustee testified that on January 13, 2022, he drove to the Flagler Property and parked in the street, from where he observed the Debtors' trash can placed at the end of the driveway for periodic trash collection. The Trustee also testified that the Debtors' Lincoln vehicle was parked in the driveway, and the Flagler Property appeared to be in good shape - with the lawn and landscaping being maintained - and appeared to be occupied.

Finally, Mr. Oswald testified that or about January 13, 2022, he witnessed and photographed the Debtors moving personal effects out of the Flagler Property. He testified that he had not witnessed the Debtors moving any household goods or furnishings out of the Flagler Property before the Petition Date.[91]

### The Debtors' Testimony

The Debtors' testimony as to when they took up occupancy in the Duval Property is inconsistent at best. At Trial, Mrs. Coats testified that the Debtors moved back into the Duval Property between four and six weeks after removing the tenant from the property in November 2018. She later testified that the Debtors were residing at the Duval Property full-time as early as 2020, though she could not identify the exact

---

[90] Joint Ex. 39.
[91] Debtors' Ex. 24 at pp. 24-25.

date the Debtors took up full-time occupancy in the property. Mr. Coats did not testify at trial but testified at his deposition that the Debtors "took possession" of the Duval Property in November 2018 and moved into the property with the intent to make it their permanent home between November 2018 and February 2019, when they changed their homestead exemption with the Duval County Tax Collector.[92]

Mrs. Coats testified that the Debtors were unable to use water services at the Duval Property for lengths of time due to plumbing issues. Indeed, the Debtors gave testimony and submitted various evidence, including physical corroded pipes from the Duval Property,[93] indicating that the water could not regularly be used at the Duval Property. Mrs. Coats testified that staying at the Duval Property was "more like camping than living" and the Debtors: 1) traveled to nearby retail stores to use the restroom or to wash their hands; 2) did not wash dishes or otherwise use the kitchen sink, but rather almost exclusively used disposable eating ware and utensils; 3) did not drink water from the faucet at the Duval Property; 4) kept the majority of their clothing at the Flagler Property; and 5) drove to the Flagler Property to do laundry. Finally, while Mrs. Coats could not identify exactly when the plumbing problems were rectified and the repairs completed, she testified that they were completed before August 16, 2021, the date of the Third Recorded Judgment. However, there is no corresponding significant increase in water usage during that same time period, and Mrs. Coats had no explanation for the continued limited water usage after the

---

[92] Joint Ex. 11 at p. 47.
[93] Debtors' Ex. 26.

plumbing was purportedly repaired. Finally, Mrs. Coats testified that although there was ongoing construction at the Duval Property, the Debtors nonetheless had the intent to remain in the Duval Property – despite returning on almost a daily basis to the Flagler Property.

The Court does not find the Debtors' testimony to be credible. At the trial, Mrs. Coats struggled to answer many of the Trustee's questions and appeared confused at times. The testimony noted above and otherwise in the record is directly contradicted by the evidence presented by the HOA and the Trustee. The Debtors' intransigence and refusal to comply with multiple court orders in the State Court Action and the totality of the circumstances support the Court's finding that the Debtors' testimony lacks credibility.

### The Debtors Resided at the Flagler Property at the End of September 2021

The Debtors clearly resided at the Flagler Property at the end of September 2021. First, the Debtors' electricity usage at the Flagler Property from December 2019 through September 30, 2021 far exceeded that at the Duval Property. The water and telephone usage at the Flagler Property during that same time exponentially exceeded that at the Duval Property. The Court finds the Debtors' explanation for the low water usage at the Duval Property to be unconvincing. A review of the JEA and Volusia County Water records indicates that, during the 283 days between September 1, 2020 and August 15, 2021 (the latest date by which the plumbing repairs were purportedly completed) when there was zero water usage at the Duval Property, there was not a

single day with no water usage at the Flagler Property.[94] That pattern continued during the 32 days of zero water usage at the Duval Property between August 16, 2021 and September 30, 2021. The Court finds that there was no water usage at the Duval Property during that time not because the Debtors did not use the bathroom there, did not wash their hands there, did not use the sink there, and did not wash their clothes there, but rather because the Debtors spent very little time there and were certainly not residing there.

Second, pursuant to the Magistrate's findings, as of September 21, 2021: 1) the only furniture in the Duval Property consisted of two air mattresses, a dinette set, and a sofa; 2) the kitchen contained no stove or refrigerator: a refrigerator left behind by a former tenant was located in the garage; 3) the Debtors' furniture and clothing remained in the Flagler Property; 4) the Debtors' blind family cat resided at the Flagler Property;[95] and 5) the Debtors were unable to provide the Magistrate an inventory because they "didn't have anything." Third, Mr. Wojnar's affidavit and testimony as to the September 28, 2021 inspection, coupled with the video taken on September 28, 2021, evidence that: 1) there was no refrigerator or silverware in the kitchen; 2) the refrigerator located in the garage contained only bottles of water and a jar of peanut butter; 3) every room in the residence was under construction; and 4) it appeared that

---

[94] The water usage at the Duval Property during the months of September 2020 to August 2021 was as follows: 1) September 2020-3,000 gallons; 2) October 2020-3,790 gallons; 3) November 2020-3,300 gallons; 4) December 2020-8,420 gallons; 5) January 2021-4,490 gallons; 6) February 2021-4,300 gallons; 7) March 2021-4,450 gallons; 8) April 2021-4,180 gallons; 9) May 2021-3,400 gallons; 10) June 2021-3660 gallons; 11) July 2021-5,180 gallons; and 12) August 2021-3,260 gallons.
[95] Mrs. Coats testified at Trial that her cats died in December 2021.

no one lived in the residence. Finally, Mr. Oswald's testimony that, through at least September 21, 2021, the Debtors' vehicle was parked at the Flagler Property on a regular basis, he witnessed the Debtors driving their vehicle through the neighborhood multiple times per week, and the Debtors' trash can was regularly placed at the curb for periodic trash collection corroborates the other documentary and testimonial evidence which establishes that the Debtors were permanently residing at the Flagler Property at that time.

## The Debtors Resided at the Flagler Property on the Petition Date

While it is true that the Debtors' electric and water usage at the Duval Property exceeded their electric and water usage at the Flagler Property for the first time during October 2021 and again during November 2021, the records reflect that the Debtors' electric and water usage at the Flagler Property remained considerable into December 2021. It was not until the end of December 2021 that the Debtors' Flagler Property electric and water usage dipped to a level inconsistent with occupancy. Additionally, the credible testimony of Mr. Hassan, Mr. Mocke, the Trustee, and Mr. Oswald, coupled with the lack of credible testimony on the part of the Debtors, further convinces the Court that the Debtors resided at the Flagler Property both on and after the Petition Date.

## Disposition of the Flagler Property

As of February 27, 2022, the Flagler Property was encumbered by a mortgage lien in the amount of $856,140.87. On March 16, 2022, the Trustee filed a Motion to Sell the Flagler Property (the "Motion to Sell") (Doc. No. 85). On July 27, 2022, the

Court entered a Consent Order Granting Trustee's Motion to Sell, by which the Flagler Property was sold to a third party for $600,000. (Doc. No. 200).

### Conclusions of Law

The Trustee and the HOA argue that the Duval Property was not the Debtors' homestead as of the Petition Date, because the Debtors were residing at the Flagler Property through the Petition Date. The Court has spent considerable time reviewing the pleadings filed in this case and the State Court Action, the evidence received at and prior to Trial, the many deposition transcripts before the Court, and the testimony at the Trial. Based on the facts before the Court and applicable case law, the Court has the unenviable task of determining that the Flagler Property – and not the Duval Property – was the Debtors' homestead property at the time each of the Judgments was recorded and as of the Petition Date.

The Florida Constitution exempts a debtor's homestead from process.[96] "[T]he homestead exemption is to be liberally construed in the interest of protecting the family home."[97] A party objecting to a debtor's homestead exemption has the burden of making a strong showing that the debtor is not entitled to the claimed exemption.[98] In this case, the Trustee and HOA have met that burden of proof.

A debtor's claim of exemptions is determined as of the bankruptcy petition date, which in this case is November 9, 2021.[99] A property's homestead character "depends

---

[96] *See* Fla. Const. Art. X § 4.
[97] *Havoco of Am, Ltd. v. Hill*, 790 So. 2d 1018, 1020 (Fla. 2001).
[98] *In re Migell*, 569 B.R. 918, 920 (Bankr. M. D. Fla. 2017).
[99] *In re Hampton*, 616 B.R. 917, 921 (Bankr. S. D. Fla. 2020).

on an actual intention to reside thereon as a permanent place of residence, coupled with the fact of residence."[100] Therefore, in order to be entitled to the homestead exemption, the homeowner must meet both an objective and subjective test.[101] On the petition date, the homeowner must actually use and occupy the home and must also intend to live permanently in the home.[102]

A debtor's intent to reside permanently at a subject property is subjective and difficult to prove through testimony which, on the part of the debtor, is likely self-serving.[103] Consequently, courts often look to documentary and other evidence to determine continued intent to reside at a property claimed as homestead.[104] Additionally, "[a]ny action taken by the homeowner that is incompatible with an intention to permanently reside in a residence may cause a homeowner to lose the benefits of Article X, Section 4, of the Florida Constitution."[105]

The parties agree that prior to November 2018 the Flagler Property was the Debtors' homestead. The Debtors appear to argue that they took possession of the Duval Property when the renters moved out, at which time it became their homestead. They assert that they temporarily resided at the Flagler Property until the work on the Duval Property was complete and that their continued presence at the Flagler Property does not constitute abandonment of the Duval Property. The problem with the

---

[100] *In re Harle,* 422 B.R. 310, 314 (Bankr. M.D. Fla. 2010).

[101] *In re Franzese*, 383 B.R. 197, 203 (Bankr. M.D. Fla. 2008).

[102] *Id.; See also In re Prestwood*, 322 B.R. 463, 469 (Bankr. S.D. Fla. 2005) ("One's homestead or domicile is a rather simple equation in the end: residence plus intent to remain.").

[103] *In re Mangieri*, 2021 WL 1747422, at *4 (Bankr. M.D. Fla. May 3, 2021).

[104] *Id.*; *In re Martinez*, 595 B.R. 912, 919-20 (Bankr. S.D. Fla. 2019).

[105] *In re Franzese*, 383 B.R. at 203 (citing *Semple v. Semple*, 82 Fla. 138, 89 So. 638, 640 (Fla. 1921)).

Debtors' argument is that a homeowner cannot claim two homesteads at once, and the clear evidence discussed above directly contradicts the Debtors' testimony. The Duval Property could not become the Debtors' homestead unless and until they abandoned the Flagler Property, their indisputable long-term homestead. The issue before the Court is, therefore, not whether the Debtors abandoned the Duval Property while they completed repairs on it, but instead whether they abandoned the Flagler Property despite continuing to reside therein until well after the Petition Date. The answer is clearly no.

"Once a property is imbued with homestead status, it remains homestead until it is abandoned."[106] Abandonment occurs "when the owner leaves the home with no intention of returning, takes up permanent abode at another place, and pursues a livelihood in the new area."[107] A homeowner's absence from his property does not necessarily mean he has abandoned the property, resulting in the loss of the homestead exemption.[108] Rather, the homeowner's intent is a critical factor and must be determined by looking to the facts and circumstances of each case.[109]

Several Florida bankruptcy courts have held that a homeowner who, on the petition date, did not live in a home for which he claimed a homestead exemption had

---

[106] *In re Lloyd*, 394 B.R. 605, 610 (Bankr. S.D. Fla. 2008).
[107] *In re Mangieri*, 2021 WL 1747422, at *4.
[108] *Id.* Of course in this case the Debtors appear to seek a finding that they in fact abandoned the Flagler Property shortly after November 2018, without which they could not have taken possession of the Duval Property.
[109] *Id.*

not abandoned the property and was therefore entitled to the exemption.[110] All of those cases, however, addressed the specific issue of abandonment and involved a homeowner who sought the protection of the homestead exemption as to a home which was indisputably homestead property in the first instance but in which the homeowner no longer resided on the petition date. Moreover, none of the cases involved a homeowner who established/claimed another homestead during the absence. Those cases do not support the Debtors' claim of a homestead exemption as to the Duval Property because, while the Duval Property was likely their homestead as late as 1997, the Debtors subsequently established multiple homesteads, the last of which was the Flagler Property.

If anything, the cases support a finding that the Debtors did not abandon the Flagler Property. In *In re Mangieri*, the debtor owned a home (the "Cascada Home") which he purchased with his former girlfriend.[111] From August 2018 to May 2020, the debtor lived in the Cascada Home and intended to remain there permanently. In May or June 2020, after a bad breakup with his girlfriend, the debtor began staying with his new girlfriend at her home, where he stayed until December 2020. The debtor lived at his new girlfriend's home when he filed his bankruptcy petition in September 2020. A judgment creditor objected to the debtor's claim of homestead exemption as to the Cascada Home. The court found that the debtor did not intend to abandon his

---

[110] *See id.*; *In re Lloyd*, 394 B.R. at 614; *In re Betancourt*, 154 B.R. 90, 93 (Bankr. M.D. Fla.1993); *In re Imprasert*, 86 B.R. 721, 723 (Bankr. M. D. Fla. 1988).
[111] *In re Mangieri*, 2021 WL 1747422, at *1.

homestead based on the following facts: 1) he continued to fulfill his financial responsibilities as to the Cascada Home; 2) he left several items of furniture and personal property there after he moved out; 3) he continued to receive mail at the Cascada Home and returned regularly to retrieve it; and 4) he did not change his address from the Cascada Home for important documents. The court concluded that the creditor did not meet its burden of proving the debtor left the Cascada Home with no intention of returning or that he established a new permanent residence at another place and overruled the objection to the homestead exemption.

In *In re Lloyd*, the debtor, who lived in a rented duplex in California, filed bankruptcy in Florida in 2007 and claimed a homestead exemption as to real property in Key West.[112] The debtor had lived in the Key West property for many years but relocated, along with her minor children, to California in 2003. Once in California, the debtor enrolled her children in school, opened bank accounts, obtained a California driver's license, and registered to vote in California. Shortly after the relocation, the debtor leased the Key West property for approximately six months. After a hurricane caused flood damage to the property in 2005, the debtor listed the property for sale because it was unlivable. A judgment lien creditor objected to the debtor's claim of homestead exemption, arguing that she abandoned the Key West property when she moved to California and leased the property.

---

[112] *In re Lloyd*, 394 B.R. at 608.

The court found that the debtor never intended to abandon the Key West property and that her actions such as coming and going to Florida for the purpose of fixing up the property, keeping it in livable condition, and leasing it in her absence were consistent with an intention to keep the property. The court noted that the debtor did not establish a permanent residence in California and had not therefore established a domicile at some other place, to the exclusion of the Key West property. The court held that the debtor did not abandon the Key West property and overruled the creditor's objection to the debtor's claim of homestead exemption.

In *In re Betancourt*, the debtor rented her condominium located in Miami, Florida to a third party for a year in order to move to New York to help her daughter and grandchildren.[113] The debtor's financial situation did not permit the unit to remain vacant during that time. Prior to the termination of the lease, the debtor filed a bankruptcy petition. The debtor contended that she did not intend to abandon the Miami property, and there was no evidence to the contrary. The court found that the debtor did not intend to abandon the property and overruled the trustee's objection to the debtor's claim of exemption.

In *In re Imprasert*, the debtors owned a homestead property in Sarasota, Florida.[114] They purchased property in Tampa because protracted litigation in which they were involved necessitated their presence there. The debtors rented their Sarasota property under a one-year lease to a third party. At the conclusion of the Tampa

---

[113] *In re Betancourt*, 154 B.R. at 91.
[114] *In re Imprasert*, 86 B.R. at 721.

litigation, the debtors returned to the Sarasota property. The court found that the debtors left the Sarasota property for financial reasons only and possessed an actual intent to return to the property and live there as their permanent place of residence once the Tampa litigation concluded. The court held that the debtors did not abandon the Sarasota property and overruled the trustee's objection to the debtors' claim of homestead exemption.

The common theme in each of the foregoing cases is that, while the debtors did not reside on the petition date in the property they sought to claim as an exempt homestead, they possessed an intent to live there as their permanent place of residence. In other words, the factual predicate to the creditor/trustee's abandonment claim in each case was the debtor(s)' non-residence on the petition date, which was then overcome by the debtor(s)' intent to return. The facts and circumstances of the instant case prove that as of the Petition Date, the Debtors had not abandoned the Flagler Property as their homestead. Rather, on and after the Petition Date, the Debtors were still residing at the Flagler Property and maintained an intent to continue to live in the Flagler Property.

As the Court noted, the Debtors' Flagler Property electric and water usage did not dip to a level inconsistent with occupancy until the end of December 2021.[115] The Debtors' cats lived in the Flagler Property until they died in December 2021.

---

[115] The increased electric and water usage at the Duval Property during the weeks before and after the Petition Date does not convince the Court the Debtors were actually residing at the Duval Property at that time. The increased usage could be related to ongoing construction or someone leaving the lights on and the water running.

Additionally, based on: 1) Mr. Hassan's testimony as to the contents and furnishing of the Flagler Property on January 15, 2022; 2) Mr. Mocke's testimony as to the contents and furnishing of the Flagler Property and Duval Property on January 19, 2022; 3) the Trustee's observation of the Debtors' trash can's location at the end of the driveway of the Flagler Property for trash collection on January 13, 2022; and 4) Mr. Oswald's testimony that he witnessed the Debtors moving personal property out of the Flagler Property on January 13, 2022, it appears the Debtors did not abandon the Flagler Property until well after the Petition Date.

The Court recognizes some of the Debtors' actions during the almost three-year period between November 2018 and the Petition Date could possibly evidence an intent to live in the Duval Property permanently. Mr. Coats obtained a driver's license bearing the Duval Property address. Additionally, the Debtors: 1) claimed the Duval Property as their homestead for *ad valorem* tax purposes beginning in 2019; 2) provided the Duval Property address on an application to open a bank account; 3) listed the Duval Property address on their vehicle registration; 4) changed their address so that papers in the State Court Action would be mailed to the Duval Property address; and 5) made improvements to the Duval Property.

However, the Court finds some of the strongest evidence of the Debtors' intent is their payment of $10,736.15 on November 30, 2020 for the outstanding 2019 Flagler Property property taxes and their timely February 4, 2021 payment of $9,065.17 for the 2020 Flagler Property property taxes. The Debtors paid almost $20,000 toward taxes on the Flagler Property at a time when they appeared to owe less than $2,700 for

the outstanding 2019 property taxes on the Duval Property and, on the Petition Date, owed three years of property taxes on the Duval Property. These payments (or lack thereof) are simply incompatible with the Debtors' assertion of a permanent intent to reside in the Duval Property as of the Petition Date. In other words, if the Debtors had intended to abandon the Flagler Property and make the Duval Property their permanent residence, why would they pay almost $20,000 for property taxes on the Flagler Property instead of using a portion of those funds to remain current on the tax obligations for the Duval Property. Additionally, it is nonsensical to the Court why the Debtors, if they truly intended to return to the Duval Property and permanently reside there, did not use any portion of the almost $20,000 to make much needed repairs to the property. If the Debtors intended to permanently reside in the Duval Property, their immediate priority would have been to make it habitable and comfortable as soon as possible. However, Mr. Mocke's unrebutted testimony established the "primitive" and unfinished condition of the Duval Property more than two months after the Petition Date.

The Court finds that the Debtors intended to reside at the Flagler Property as long as they possibly could, opting to live in a large fully furnished and decorated home over a much smaller mostly unfurnished one in a state of disarray and disrepair. Their motivation to eventually return to the Duval Property was borne not out of a sincere attempt to make it their homestead but out of: 1) their loss in the State Court Action, the culmination of six years of litigation, in which they, in the words of the Trial Court, "unnecessarily increased the financial burden of [the] lawsuit to [the HOA],

34

unnecessarily burdened the [Trial Court] with resulting motions, hearings and orders and unnecessarily caused delay" in a "willful, deliberate, and contumacious" manner; and 2) their desire to preserve for themselves whatever equity existed in the Duval Property, as the Flagler Property was fully encumbered. Even assuming, however, that the Debtors formed an intent to live permanently in the Duval Property some time prior to the Petition Date, the Debtors clearly did not reside in the Duval Property before the Petition Date.

### Conclusion

The evidence does not establish that the Debtors left the Flagler Property before the Petition Date with no intention to return and took up permanent abode at the Duval Property. Rather, the evidence clearly establishes the Debtors intended to reside and actually resided in the Flagler Property both on and after the Petition Date and thus did not meet the requisite objective and subjective tests to claim the Duval Property as their homestead.[116] The First and Second Recorded Judgments attached and acted as valid and enforceable liens on the Duval Property as of their respective dates of recording. Pursuant to the Consent Judgment, the value of the Third Recorded Judgment, its lien position, and its enforceability will be preserved for the benefit of the bankruptcy estate. The Court will enter separate orders and judgments consistent with these Findings of Fact and Conclusions of Law.

---

[116] *See id.*